UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/22/16

---------------------------------------------------- x

WHITE HAWTHORNE, LLC, *et al.*,

        Plaintiffs,

        v.

THE REPUBLIC OF ARGENTINA,

        Defendant.

:
:
:
:
:
:
:
:
:
:

16-cv-1042 (TPG)

---------------------------------------------------- x

BYBROOK CAPITAL MASTER FUND LP, *et al.*,

        Plaintiffs,

        v.

THE REPUBLIC OF ARGENTINA,

        Defendant.

:
:
:
:
:
:
:
:
:

16-cv-1192 (TPG)

---------------------------------------------------- x

TRINITY INVESTMENTS LIMITED,

        Plaintiff,

        v.

THE REPUBLIC OF ARGENTINA,

        Defendant.

:
:
:
:
:
:
:
:
:

16-cv-1436 (TPG)

---------------------------------------------------- x

## OPINION

In this action brought by certain holders of Argentine bonds, the Republic of Argentina moves for partial dismissal under Rule 12(b)(6) for failure to state a claim.  For the following reasons, the court grants the Republic's motion.

<u>Background</u>

Plaintiffs are certain institutional investors who hold beneficial interests in Republic-issued bonds governed by New York law.  These plaintiffs own "FAA Bonds," issued under a 1994 Fiscal Agency Agreement ("1994 FAA"), and one plaintiff also owns a "Brady Bond," issued under a 1993 Fiscal Agency Agreement ("1993 FAA").

The 1994 FAA, § 1(c), contains a *pari passu* clause:

> The Securities will constitute . . . direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank *pari passu* and without any preference among themselves. The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness . . . .

The 1993 FAA, § 9(a)(ii), also features a *pari passu* clause, listed as an "Affirmative Covenant[]":

> Argentina covenants and agrees that, so long as any Bond remains outstanding, Argentina shall . . . [e]nsure that at all times its obligations hereunder constitute unconditional general obligations of Argentina ranking at least *pari passu* in priority of payment with (A) all other Indebtedness of Argentina which by its terms is, or at the option of the holder thereof may be, payable in a currency other than Pesos and (B) all obligations of Argentina with respect to any Indebtedness issued by a Designated Argentine Governmental Agency which by its terms is, or at the option of the holder thereof may be, payable in a currency other than Pesos.

After the Republic suffered an economic crisis, the Argentine government declared a moratorium on payment of its sovereign debts on December 24, 2001. This meant that the Republic stopped making scheduled payments on its bonds, triggering defaults on the FAA Bonds and the Brady Bond. In the years shortly following the Republic's default, many holders of beneficial interests in Argentine bonds began filing actions against the Republic in this court.

In February 2016, over fourteen years after the Republic's default, plaintiffs filed suit in this court. Their suit came shortly after the Republic had published the "Propuesta," its global proposal to settle all its defaulted debts. Plaintiffs are seeking breach-of-contract damages based on nonpayment of principal and interest, as well as injunctive relief for alleged violations of the applicable *pari passu* clause. In a novel turn, plaintiffs also seek money damages for breach of the *pari passu* clause.

After plaintiffs amended their complaints, the Republic moved for partial dismissal under Rule 12(b)(6) for failure to state a claim. The Republic seeks dismissal of the claims for breach of the *pari passu* clauses and any claims that accrued more than six years before the operative complaints were filed. The court will now consider the Republic's motion.

<u>Discussion</u>

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim [for] relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 547 (2007). The complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for

the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 545, and must permit the court "to infer more than the mere possibility of misconduct," *Iqbal*, 556 U.S. at 679.   In making its determination, the court should reject "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement." *Id.* at 678 (citations omitted).   A claim should also be dismissed if it alleges facts that are "obviously without merit," such as when "its unsoundness so clearly results from the previous decisions of this court as to foreclose the subject." *Hagans v. Lavine*, 415 U.S. 528, 537 (1974).

### 1. The *Pari Passu* Clause

One of the claims plaintiffs' raise in their amended complaints is that the Republic is in breach of the *pari passu* clause. The Republic moves to dismiss those claims.

### A. *Breach of the Pari Passu Clause*

The *pari passu* clause has played a significant role in the Argentine litigation. The 1994 FAA's *pari passu* clause provides that the FAA Bonds "shall at all times rank *pari passu* and without any preference among themselves," and that the Republic's "payment obligations" on the FAA Bonds "shall at all times rank at least equally" with certain indebtedness payable in a currency other than Argentine Pesos. *See* 1994 FAA §§ 1(c), 11. The 1993 FAA's *pari passu* clause promises that the Republic's obligations on the Brady Bond "shall . . . rank[] at

least *pari passu* in priority of payment" with certain indebtedness payable in a currency other than Argentine Pesos. *See* 1993 FAA § 9(a)(ii).

Although the meaning of the *pari passu* clause has been hotly disputed, the Republic's "extraordinary conduct" during its prior administration led this court to find breach of the clause in December 2011. *See Order, NML Capital Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Dec. 7, 2011). The Republic's failure to make scheduled payments on its debts was part of this conduct, but it was only one element in a complicated set of circumstances. In subsequent orders, the court emphasized that what constituted breach was the Republic's "entire and continuing course of conduct," including harmful legislation like the Lock Law and incendiary statements by the former administration. *See* Op. & Order at 25, *NML Capital Ltd. v. Republic of Argentina*, No. 14-cv-8601 (S.D.N.Y. June 5, 2015). Likewise, the Court of Appeals held that it was the "*combination* of Argentina's executive declarations and legislative enactments" and its entire "*course of conduct*" that constituted breach of the *pari passu* clause. *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 260, 264 n.16 (2d Cir. 2012) (emphases added). In short, the Republic violated the *pari passu* clause not merely by being a sovereign nation in default, but by being "a *uniquely* recalcitrant debtor." *See NML Capital v. Republic of Argentina*, 727 F.3d 230, 247 (2d Cir. 2013) (emphasis added).

As this court recognized earlier this year, the Republic's November 2015 election of Mauricio Macri "changed everything." Order at 13, *NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-8601 (S.D.N.Y. Feb. 19, 2016) ("Indicative

Ruling"). President Macri's government "has consistently declared its desire to resolve the disputes," which "marked a turning point in the Republic's attitude and actions." *Id.* at 7. The court was not alone in acknowledging the Republic's transformation. Daniel Pollack, the Special Master appointed to oversee negotiations, praised the Republic's leaders for their "courage and flexibility in stepping up to and dealing with this long festering problem which was not of their making," and the U.S. Treasury Secretary "commended the Republic's good-faith efforts to resolve the disputes." *Id.* at 8–9.

Plaintiffs' amended complaints ignore these significantly changed circumstances. What plaintiffs allege the Republic has done comes nowhere close to the "extraordinary conduct" that led this court and the Court of Appeals to find breach of the *pari passu* clause. Rather, plaintiffs recite ancient history and rely on conduct that this court has recognized is no longer occurring, such as the effects of the now-repealed Lock Law and Sovereign Payment Law. *See* Order, *NML Capital, Ltd. v. Republic of Argentina,* No. 08-cv-6978 (S.D.N.Y. Apr. 22, 2016) ("Vacatur Order"). And plaintiffs quote statements made by *former* Republic officials—people who no longer set the policy as to the "treatment" of plaintiffs' bonds, and whose proclamations differed dramatically from those of the Macri administration. Once the court sets aside these historical digressions, the amended complaints boil down to a simple but inadequate allegation: that mere payment to other creditors, including payment encouraged by this court to settle claims on other defaulted debt, constitutes a violation of the *pari passu*

clause.  In short, plaintiffs allege breach due to the Republic's decision to pay *other* creditors while plaintiffs hold out for a better deal.

Nonpayment on defaulted debt alone is insufficient to show breach of the *pari passu* clause.  As the Court of Appeals made clear, it did not hold "that a sovereign debtor breaches its *pari passu* clause every time it pays one creditor and not another, or even every time it enacts a law disparately affecting a creditor's rights."  *NML Capital, Ltd.*, 727 F.3d at 247; *accord Exp.-Imp. Bank of Republic of China v. Grenada*, No. 13-cv-1450, 2013 WL 4414875, at *4 (S.D.N.Y. Aug. 19, 2013) (pleadings alleged that Grenada had paid exchange bondholders without paying holdouts and had indicated it would not pay holdouts: "Those two facts alone fail to establish Grenada's liability").  The U.S. Government, too, has maintained the position that simply paying some creditors and not others does not constitute breach.  *See* Br. for the United States as *Amicus Curiae* in Supp. of Reversal at 12, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105(L) (2d Cir. Apr. 4, 2012) (arguing that a "borrower does not violate [the *pari passu*] clause by electing as a matter of practice to pay certain indebtedness in preference to the obligations outstanding under the agreement in which this clause appears"); Br. for the United States as *Amicus Curiae* in Supp. of the Republic of Argentina's Pet. for Panel Reh'g & Reh'g En Banc, *NML Capital, Ltd. v. Republic of Argentina*, No. 12-105(L) (2d Cir. Dec. 28, 2012).

Plaintiffs invoke Argentine Law 27,249, which they label the "New Lock Law," to support their claim that the Republic is in breach of the *pari passu* clause.  In fact, Law 27,249 repealed the Lock Law and authorized settlement

payments to holders of defaulted bonds. This court has already determined that Law 27,249 represents a changed circumstance that satisfied the conditions for vacating the *pari passu* injunctions. *See* Vacatur Order at 2. Far from reinstituting the policy of the Lock Law, Law 27,249 repealed that statute, along with every other Argentine law that plaintiffs bemoan. *See* Law 27,249 art. 1.

Moreover, the Republic did not violate the *pari passu* clause earlier this year when it issued new bonds and settled with its creditors. As the Court of Appeals has held, bond "repurchases would not breach Argentina's promise . . . not to discriminate against outstanding bondholders in meeting its payment obligations to them." *NML Capital, Ltd.*, 699 F.3d at 259 n.10. If repurchases to settle claims sufficed to violate the *pari passu* clause, the Republic's "2005 and 2010 exchange offers themselves" would have been illegal—a position the Court of Appeals clearly found erroneous. *See id.*

In sum, due to the Republic's repeal of its offending "legislative enactments" and the Macri administration's resolve to settle with its creditors, the "combination" and "course of conduct" that formerly constituted breach of the *pari passu* clause no longer exists. Plaintiffs have also not alleged sufficient new conduct on behalf of the Republic to establish a breach of the *pari passu* clause. Therefore, the court holds that the Republic is not now in breach of the *pari passu* clause.

B. *Remedies Under the Pari Passu Clause*

Even if the Republic were in breach of the *pari passu* clause, the question of available remedies would have to be resolved.  Plaintiffs seek both injunctive relief and money damages.

(i) *Injunctive Relief*

Plaintiffs invoke the *pari passu* clause as a basis for injunctive relief.  As a threshold matter, this court has repeatedly held that plaintiffs have no legal right to an injunction even if they could show breach of the *pari passu* clause. *See, e.g.*, Indicative Ruling at 21 ("[P]laintiffs had no absolute legal right to the injunctions.  An injunction is an extraordinary measure that is not normally available for breach of contract."); *Aurelius Capital Master, Ltd. v. Republic of Argentina*, No. 16-628, 2016 WL 1540614, at *4 (2d Cir. Apr. 15, 2016) ("Plaintiffs-Appellants have never had a legal entitlement to an injunction.").

More to the point, the court has already found that significantly changed circumstances have rendered the *pari passu* injunctions "inequitable and detrimental to the public interest."  Indicative Ruling at 13.  The court has already assessed the equities and found that the extraordinary injunctive relief plaintiffs' seek is unwarranted.  *See NML Capital Ltd. v. Republic of Argentina*, No. 08-cv-6978, 2016 WL 836773, at *9 (S.D.N.Y. Mar. 2, 2016).  Given this background, the court finds that plaintiffs have failed to state a claim that would warrant re-imposition of the now-vacated *pari passu* injunctions.

(ii) *Money Damages*

Plaintiffs also seek money damages for the Republic's alleged violation of the *pari passu* clause. The *pari passu* clause is a covenant that, like any other covenant, is designed to govern the behavior of the debtor so as to provide greater assurance of payment to the creditor. *See, e.g.*, "Covenant," Wall Street Words (3d ed. 2003) (defining "covenant" as a "clause in a loan agreement written to protect the lender's claim by keeping the borrower's financial position approximately the same as it was at the time the loan agreement was made").

Another court in this district faced similar claims on a *pari passu* clause that underlay sovereign debt issued by the Republic of China. The court held that, "despite their invocations of a purported *pari passu* clause, plaintiffs have but one cause of action: a right to payment on the []bonds that was breached in 1960 when the PRC defaulted on the bonds." *Pons v. People's Republic of China*, 666 F. Supp. 2d 406, 414–15 (S.D.N.Y. 2009). Here, too, plaintiffs have but one cause of action: the right to payment on the bonds in light of the Republic's default and nonpayment on the bonds. The 1993 FAA and 1994 FAA establish the Republic's promises to pay bondholders on certain scheduled dates. Bondholders can accelerate these dates in certain circumstances, including if there is a breach of a covenant like the *pari passu* clause. *See* 1994 FAA § 12; 1993 FAA § 10. Had plaintiffs sought accelerated payment and not been paid by the Republic, their remedy would have been damages in the amounts owed on plaintiffs' bonds. These nonpayment damages are exactly what plaintiffs seek in their claims for breach of contract. *See, e.g.*, Trinity Am. Compl. ¶¶ 81–98. There

is simply no "separate" claim for damages for breach of the *pari passu* clause. *See Pons*, 666 F. Supp. 2d at 415.

Plaintiffs' theory of separate money damages for each breach of the *pari passu* clause is legally unsound. Even if payment to one creditor constituted breach, that act inflicts no separate monetary damage on other holders of unpaid debt. As the Court of Appeals explained in an analogous context, one "creditor's interest in getting paid is not cognizably affected" by payment to another creditor. *NML Capital, Ltd.*, 727 F.3d at 240; *cf. D.C.A. Grantor Trust v. Republic of Argentina*, 616 F. App'x 30, 32 (2d Cir. 2015) (finding that there are no "'superior' rights to property based on subjective equitable assessments of the relative fairness of paying one class of creditor or another").

It is true that the Court of Appeals expansively interpreted the range of remedies available for a breach of the *pari passu* clause. In a related case, the Republic took the position that injunctive relief was unavailable because the 1994 FAA specified acceleration as a remedy for breach. The Court of Appeals rejected that argument. Because there is neither a clause limiting the available remedies, nor one precluding injunctive relief, "the full panoply of appropriate remedies remains available." *NML Capital, Ltd.*, 699 F.3d at 262. Crucially, though, the Court of Appeals was not dictating a blanket rule that mandated all remedies be available for any type of breach. Rather, it was merely distinguishing between different types of remedies available under the bond agreement. Moreover, as outlined above, separate damages for breach of the *pari passu* clause would not be an "appropriate" remedy. *See id.*

Plaintiffs' claims for money damages under the *pari passu* clause are no more than claims for unpaid principal and interest.  As such, plaintiffs' request for money damages for breach of the *pari passu* clause are not an independent cause of action, and the court dismisses claims seeking that relief.

## 2. Statute of Limitations

The Republic also maintains that the applicable statute of limitations bars claims for damages that accrued more than six years before plaintiffs filed their complaints.  Plaintiffs respond that the applicable statute of limitations gave them twenty years to bring their claims, and that, in any event, the Republic's actions restarted or tolled the limitations period.

### A. *The Applicable Statute of Limitations*

New York's CPLR § 213 imposes a six-year statute of limitations for "an action upon a contractual obligation or liability, express or implied." N.Y. CPLR § 213(2).  CPLR § 211 then carves out an exception to § 213's general rule by extending the limitations period to twenty years for claims on certain bonds.

The exception under § 211 requires that the bonds (1) are "indebtedness of the state of New York or of any person, association or public or private corporation"; (2) were "originally sold by the issuer after publication of an advertisement for bids for the issue in a newspaper of general circulation"; and (3) were "secured only by a pledge of faith and credit of the issuer."  CPLR § 211(a).  The Republic challenges § 211's applicability on two main grounds. First, the Republic argues that, as a foreign sovereign, its bonds do not fall within § 211's statutory ambit.  Second, the Republic asserts that its bonds were not

sold after an advertisement for bids in a newspaper of general circulation, another requirement under § 211.

The court will now consider whether § 211's exceptional limitations period applies, or whether the dispute is governed by the general limitations period in § 213.

> (i) *Foreign Sovereigns as "Persons"*

The parties dispute whether the Republic's bonds fall within the limited group covered by § 211, which includes only "indebtedness of the state of New York or of any person, association or public or private corporation." The only conceivable way § 211 could apply is if the Republic's bonds constitute "indebtedness of . . . [a] person."

In New York, "[i]t has long been the law . . . that the term 'person' generally does not include a governmental entity, unless a statutory definition expressly includes that governmental entity within the meaning of the term." *Leonard v. Masterson*, 70 A.D.3d 697, 698 (2d Dep't 2010). "[I]n its ordinary or legal signification," the term "person" does not "embrace a State or government." *In re Fox's Will*, 52 N.Y. 530, 535 (1873); *see also Towner v. Jimerson*, 67 A.D.2d 817, 817 (4th Dep't 1979) (holding that "[a] statute does not apply to the State where its sovereign rights, prerogatives or interests are involved, unless it is specifically mentioned therein or included by necessary implication"); *Port of N.Y. Auth. v. J.E. Linde Paper Co.*, 205 Misc. 110, 114–15 (N.Y. Mun. Ct. 1953) (recognizing "the well-established rule that general legislation is inapplicable to the State or its agencies unless there is express language subjecting the

sovereign to the terms thereof"). The CPLR does not define "person," nor does § 211 expressly indicate that government entities fall within the meaning of the term. Under New York's general principles of statutory construction, then, there is a strong presumption that the Republic, as a sovereign, is not a "person" under § 211.

Other interpretive canons suggest that the Republic is not a "person" under § 211. First, under New York law, where a statute "expressly describes" the entities "to which it shall apply, an irrefutable inference must be drawn that what is omitted or not included was intended to be omitted or excluded." McKinney's Statutes § 240. Thus, where § 211 expressly lists "the state of New York or [] any person, association or public or private corporation," there is an "irrefutable inference" that the legislature intended to exclude foreign sovereigns, which were not included. Moreover, courts should generally construe statutes to avoid rendering words "superfluous" by "giv[ing] effect, if possible, to every clause and word of a statute." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (citations omitted). If the word "person" in § 211 encompassed governmental entities, there would be no need to list separately "New York state." And if the word "person" actually meant "legal person"—that is, any legal entity—then there would be no need to include "association or public or private corporation." *See* Black's Law Dictionary (defining "legal person" as an "entity, such as a corporation, created by law and given certain legal rights and duties of a human being"). Were the court to adopt that construction, every listed issuer aside from "person" would be redundant.

The legislative history also indicates that foreign sovereigns are not "persons" under § 211.   In 1941, the New York legislature shortened the limitations period for actions on all sealed instruments from twenty to six years. This change had the unintended consequence of harming the market for New York bonds.   Decl. of Elizabeth Block ("Block Decl.") (Ex. I at I-47).   New York's Fiscal Agent had to refuse payment on "a considerable amount" of bonds originally issued under the twenty-year period, including some belonging to people who had delayed in presenting their bonds due to military service in World War II.   Block Decl. (Ex. I at I-53).   Some of those people were "good 'customers' of the State . . . who [were] [] prospective buyers of large additional amounts." Block Decl. (Ex. I at I-53–54).   Because New York was preparing to issue over $800 million of new bonds, there was concern that "publicity regarding refusal of payment of outstanding matured bonds and coupons . . . would militate against the efforts . . . to widen the market for State obligations."   Block Decl. (Ex. I at I-54).   In addition, some investors had reported that the shortened limitations period had made New York bonds uncompetitive.   Block Decl. (Ex. I at I-54).   In other "important commercial states"—including neighboring Massachusetts, New Jersey, and Pennsylvania—the limitations periods were as long as twenty years.   Block Decl. (Ex. I at I-54).   This led the Investment Bankers Association of America to petition the New York legislature to improve "marketability" of the state's bonds.   Block Decl. (Ex. I at I-55).

In response to these concerns, New York's Law Revision Commission undertook a study and report "so as to reestablish with respect to obligations of

the State and its municipalities the 20-year period formerly in effect." Block Decl. (Ex. I at I-47). Although the clear focus was on bonds issued by New York and its municipalities, constitutional concerns meant that the Law Revision Commission recommended the inclusion of a limited group of other bonds. The New York Constitution mandated that, if the legislature revived claims against the state, "obligations 'as between citizens of the state' which are of the same class as the state obligations, [must] be similarly revived." Block Decl. (Ex. I at I-47) (citing New York Const. art. 3, § 19). At the same time, an overly broad reinstatement of claims raised concerns that "private business would be retrospectively disturbed without good cause," and "any revival of a private cause of action already barred [could] raise a question under the Fourteenth Amendment of the Federal Constitution and . . . the State Constitution." Block Decl. (Ex. I at I-47). In other words, the legislature could not revive claims against the state alone, nor could it revive claims against all debtors. The solution was to tailor the covered group of bonds as narrowly as possible to the characteristics of New York and its municipalities. Block Decl. (Ex. I at I-50). According to the contemporaneous understanding, aside from New York state and municipal bonds, the bonds to which the new statute would apply "would be few" and implicated "*private* issuers," not other public entities. Block Decl. (Ex. I at I-10) (emphasis added).

The Law Revision Commission's study and report ultimately led the New York legislature to enact the statute now codified as § 211. Block Decl. (Ex. I at I-47). To address the concerns outlined above, the statute applied only to a

limited group of bonds and served as a narrow exception to the generally applicable six-year limitations period. The statute, like the study and report that preceded it, focused on New York state and municipal bonds, but also included some similar bonds issued by private actors. This legislative background serves as compelling evidence that § 211 was never meant to cover bonds issued by foreign sovereigns.

The two courts to have considered this issue concluded that foreign sovereigns are not "persons" under § 211. In *Morris v. People's Republic of China*, the court found that § 211 did not apply because "person" meant "natural person." 478 F. Supp. 2d at 571 n.15. Similarly, in *World Holdings, LLC v. Federal Republic of Germany*, the court observed that "New York desired this 20-year period to apply to very few 'non-public' obligations in addition to New York's and its municipalities' obligations." 794 F. Supp. 2d 1341, 1351 (S.D. Fla. 2011). After engaging in a thoughtful examination of the statute's plain language and legislative history, the *World Holdings* court concluded that Germany, as a sovereign, was not a "person" under § 211. 794 F. Supp. 2d 1341. In keeping with these decisions, other courts faced with claims on defaulted sovereign debt have applied § 213's standard six-year limitations period instead of § 211's exceptional one. *E.g., Dar El-Bina Eng'g & Contracting Co. v. Republic of Iraq*, 79 F. Supp. 2d 374, 377–78 (S.D.N.Y. 2000); *Schmidt v. Polish People's Republic*, 579 F. Supp. 23, 25 (S.D.N.Y. 1984).

Plaintiffs counter that natural persons do not commonly issue bonds and that limiting § 211 to natural persons would therefore be "peculiar." Pl. Br. at

23.  Plaintiffs then add that the court should not restrict the meaning of § 211 to natural persons because courts should avoid interpretations of statutes that would lead to absurdities or "absurd consequences." Pl. Br. at 24.  Even if, however, limiting the word "persons" under § 211 to mean only natural persons would be "peculiar," it is not necessarily "patently absurd." This meaning makes sense when examined in light of the statute's legislative history, as discussed in more detail above.  The legislature intended for § 211 to primarily affect debt issued by the State.  Thus, the fact that very few, if any, bonds issued by "persons," however that term is defined, other than New York state would be covered by the court's reading of § 211 is not an "absurd consequence." Instead, it seems to be the reading that most comports with the purpose of § 211.

Ultimately, even the most generous reading of § 211's plain text and legislative history leads to major doubts that the legislature intended to include foreign sovereigns when using the term "person."  A fair conclusion might be that the legislature simply was not thinking about foreign-issued bonds when it passed the statute in 1950.  At best, then, there is uncertainty baked into plaintiffs' preferred interpretation, and the court should heed New York's general presumption that the term "person" does not include governmental entities.  *See Leonard*, 70 A.D.3d at 698.

(ii) *Advertisements for Bids*

Even if the Republic were a "person" under § 211, plaintiffs would need to show there was an "advertisement for bids" on the bonds.

When the legislature extended the statute of limitations in 1950, there existed a specific procedure for the competitive bid process on municipal bonds. By law or practice, municipalities in many states sold their bonds through competitive bidding at public auction rather than through private arrangements.[1]   When a municipality sold bonds by competitive bid, it solicited bids "through an official notice of sale published in newspapers."[2]   Contemporary sources confirm that, around the time when the legislature enacted § 211, New York issued bonds through this bidding process and published advertisements for bids in *The New York Times* and *The Bond Buyer*.[3]

In an attempt to show that the Republic's bonds were sold after "an advertisement for bids," plaintiffs point to various authorizing resolutions in the *Boletín Oficial de la República Argentina*.   The most obvious flaw with plaintiffs' theory is that those resolutions do not even request bids.   On a more nuanced level, the resolutions clearly do not conform to the procedure of "advertising for

---

[1] Block Decl. (Ex. H at 171) (David S. Kidwell et al., *Investment Banking and the Underwriting of New Municipal Issues*, The Municipal Bond Handbook (Frank J. Fabozzi et al. eds., 1983)); Block Decl. (Ex. G at 27) (Sylvan G. Feldstein et al., *Introduction to Municipal Bonds*, The Municipal Bond Handbook).

[2] Block Decl. (Ex. H at 173–74).   These notices usually contained important information, such as the "(1) date, time, and place to submit bids; (2) amount of the serial maturities; (3) type and purpose of the bonds, including a statement about security of interest and principal payments; (4) the basis of award; (5) miscellaneous bidding restrictions; and (6) miscellaneous bond features, such as the callability." Block Decl. (Ex. H at 173–74).

[3] *See* Block Decl. (Ex. J) (Bond Buyer, Oct. 15, 1949, at 15); *id.* (Ex. K) (N.Y. Times, Oct. 15, 1949, at 23, http://timesmachine.nytimes.com/timesmachine/1949/10/15/issue.html).

bids" outlined above.  This is unsurprising given that the Republic's procedure for selling bonds—unlike the procedure for New York municipal bonds incorporated in  § 211—did not involve a solicitation of bids but rather a negotiated contract with various underwriters.[4]  The Republic had already chosen the underwriters and set the interest rates before the resolutions appeared in the *Boletín Oficial.*  Thus, the resolutions plaintiffs reference could not have been "for bids."

Additionally, the resolutions do not contain any information about bidding, nor do they contain the kind of detailed information on the bonds like that seen in the advertisements published in *The New York Times* and *The Bond Buyer.*  This dearth of pertinent information is important because the legislature included § 211's "advertisement for bids" requirement because longer limitations periods are justifiable when "the terms of sale are patent, and offered to the world."  Block Decl. (Ex. I at I-51).  The resolutions in the *Boletín Oficial* fail to give a prospective buyer crucial information he would need.

(iii) *Newspaper of General Circulation*

The parties also dispute whether the *Boletín Oficial* is a "newspaper of general circulation" under § 211.

---

[4] *See, e.g.,* Block Decl. (Ex. D) (Prospectus Supplement for bonds bearing ISIN US040114AR16 at S-15); Block Decl. (Ex. G at 26–27) ("Public offerings may be marketed by either competitive bidding or direct negotiations with underwriters."); Block Decl. (Ex. F) (Public Securities Association, Fundamentals of Municipal Bonds 69 (3d ed. 1987) ("In a negotiated offering, there is no bidding; the underwriter is chosen beforehand.")).

In analogous contexts, New York courts have found that a publication constituted a "newspaper of general circulation" when it "was available through . . . newsstands in Manhattan," when many "copies were sold daily," and when it "contain[ed] general news as well as general advertisements." *Gampel v. Burlington Indus., Inc.*, 252 N.Y.S.2d 500, 501–02 (Sup. Ct. N.Y. Cty. 1964); *see also Williams v. Colwell*, 14 A.D. 26, 32 (Sup. Ct. Erie Cty. 1896) (determining that publication was a "newspaper" because "several columns are devoted to general advertising, and to the publication of local and other news of general interest, and that it has a general circulation; [and] it is printed in sheet form, like other newspapers, and at frequent intervals"); *Deutsch v. McGurrin*, 241 N.Y.S.2d 393, 395 (Sup. Ct. N.Y. Cty. 1963) (finding publication is not a "newspaper" because it "does not contain 'several columns . . . devoted to general advertising, and to the publication of local and other news of general interest'" (citing *Colwell*, 14 A.D. at 32)).

By contrast, the *Boletín Oficial* is not available at newsstands or sold on a frequent basis, does not contain general news or advertisements, and does not resemble a traditional newspaper. Rather, the *Boletín Oficial* is the Republic's publication of enacted laws, official decrees, and other official acts of the Executive Branch. Information is published in the *Boletín Oficial* as a matter of Argentine law, and the information contained within serves to validate its

authenticity.  *See* Decree No. 659/47 Arts. 5, 6 (Ex. L).[5]  These facts, taken together, reveal that the *Boletín Oficial* is not a "newspaper of general circulation" and provide a further reason why § 211 does not apply to claims on these Argentine bonds.[6]

 B. *Applying CPLR § 213*

Having found that § 211 does not govern, the court will now apply § 213's general limitations period to the facts of this case.

In an action for defaulted bond payments, the six-year limitations period applies to both defaulted principal and interest.  It begins to run for each interest installment on the day payment is due and for principal on the day after the

---

[5] In this way, the *Boletín Oficial* is akin to the U.S. Federal Register, which U.S. regulations repeatedly distinguish from "newspapers of general circulation" by listing the Federal Register separately from newspapers of general circulation. *See, e.g., Dep't of Interior v. South Dakota*, 519 U.S. 919, 920 (1996) (noting the requirement that the Secretary of the Interior "publish in the Federal Register, or in a newspaper of general circulation"); *Role Models Am., Inc. v. White*, 317 F.3d 327, 329 (D.C. Cir. 2003) (noting the requirement that the Secretary of Defense "publish in the Federal Register and in a newspaper of general circulation"); 43 CFR § 2884.20(a) (noting the Bureau of Land Management's procedure of "publish[ing] a notice in the Federal Register or a newspaper of general circulation").  Although these federal authorities are not dispositive of what New York's legislature had in mind when it enacted § 211, they are certainly instructive when interpreting the statutory term.

[6] As to the Brady Bond, the Republic offers yet another reason why § 211 cannot apply: because the bond is collateralized, it does not satisfy § 211's requirement that it be "secured only by a pledge of the faith and credit of the issuer."  Plaintiffs appear to concede that the Brady Bond is collateralized.  *See* White Hawthorne Am. Compl. ¶ 4 (indicating that the Brady Bond is subject to the terms of the Collateralized Discount Bond and Par Bond Exchange Agreement).  The court need not reach this issue, however, because of the many other reasons that § 211 does not apply to these claims.

bond matures.   *Morris,* 478 F. Supp. 2d at 571–72.   Each missed interest payment triggers a separate limitations period.   *Phx Acquisition Corp. v. Campcore, Inc.,* 81 N.Y.2d 138, 141 (1993).   In other words, a plaintiff may recover only those interest payments due within the six years prior to commencing the action, and any claim for earlier installments is time-barred. *Snyder v. Madera Broad., Inc.,* 872 F. Supp. 1191, 1197 (E.D.N.Y. 1995).

Each of the Republic's missed interest payments triggered a six-year limitations period on a claim for that installment, and the date of maturity or acceleration began the period on a claim for principal.   As to the FAA Bonds, this means that all of plaintiffs' claims for interest payments due more than six years prior to the filing of these actions are time-barred.   And as to the Brady Bond, which was accelerated in February 2007, all claims are untimely because they were not brought within six years after the debt became due and payable.   *See Phx Acquisition Corp.,* 81 N.Y.2d at 143; *Duval v. Skouras,* 44 N.Y.S.2d 107, 111 (Sup. Ct. N.Y. Cty. 1943).

Plaintiffs' claims for equitable relief also come too late.   Not only does § 213's six-year limitations period apply to claims for equitable relief, *see* Siegel, *N.Y. Prac.* § 36 (5th ed. 2016), but the statute of limitations for the *legal* remedy governs when "both a legal and an equitable remedy exists as to the same subject-matter," *see Grosz v. Museum of Modern Art,* 772 F. Supp. 473, 481 (S.D.N.Y. 2010) (quotation omitted).   Plaintiffs here "cannot enlarge the limitations period for [their] claim[s] seeking damages relief by also seeking equitable relief," and accordingly their claims for *pari passu* injunctions are

untimely.  *See ABS Entm't, Inc. v. CBS Corp.*, No. 15-cv-6801, 2016 WL 676464, at *3 (S.D.N.Y. Feb. 18, 2016).

C. *Tolling and Restarting the Statute of Limitations*

Plaintiffs attempt to evade the Republic's statute-of-limitations defense by alleging that the Republic restarted the running of the statute of limitations by "acknowledging" plaintiffs' debt.

"[A] cause of action accrues for the purpose of setting the statute in motion as soon as the creditor, by his own act, and in spite of the debtor, can make the demand payable."  *Knapp v. Greene*, 29 N.Y.S. 350, 351 (1st Dep't 1894) (quotation omitted); *see also Environics, Inc. v. Pratt*, 376 N.Y.S. 2d 510, 511 (1st Dep't 1975) (statute of limitations accrues from the time creditor had a right to make demand on the note because "parties could not have intended to permit the holder of the note to postpone its maturity as long as it chose to do so").

Under New York General Obligations Law § 17-101, a party may restart a statute of limitations through "[a]n acknowledgement or promise contained in a writing signed by the party to be charged thereby."  Such "a writing, in order to constitute an acknowledgment of a debt, must recognize an existing debt and contain nothing inconsistent with an intention on the part of the debtor to pay it."  *Estate of Vengroski by Vengroski v. Garden Inn*, 114 A.D.2d 927, 928 (2d Dep't 1985); *see also Curtiss-Wright Corp. v. Intercontinent Corp.*, 277 A.D. 13, 16 (1st Dep't 1950) (holding that "an acknowledgment is effective only if it imports an intention to pay or at least contains nothing inconsistent with an intention to pay").

24

Plaintiffs allege that certain "Trimester Statements"[7] and an "18-K Annual Report" constitute acknowledgments under § 17-101. However, the "Trimester Statements" cannot be acknowledgements because they are not "signed by the party to be charged thereby." *See* N.Y. Gen. Oblig. § 17-101. The mere fact that the "Trimester Statements" bear the title of the Finance Secretariat of the Tax and Economy Ministry of Argentina does not satisfy the signature requirement of the statute. *Cf. Mesibov, Flinert & Levy, Inc. v. Cohen Bros. Mfg. Co.*, 245 N.Y. 305, 310 (1927). Moreover, their content is inconsistent with an intention to pay plaintiffs because plaintiffs' bonds appear on a list entitled "BONDS NOT SUBMITTED TO THE EXCHANGE," and the "PUBLIC NATIONAL DEBT" listed on the report specifically "EXCLUD[ES]" plaintiffs' bonds. *See, e.g.*, Trinity Am. Compl. (Ex. N at *20, 26) (Report dated Mar. 31, 2015).

The 18-K Annual Report also contains statements that are inconsistent with an intention to pay plaintiffs because it explicitly defines "defaulted debt" as indebtedness "on which Argentina is not paying principal or interest." Trinity Am. Compl. (Ex. O at 2) (Republic's 2010 18-K). It further defines "untendered debt" as the subset of defaulted debt that was "eligible for, but not tendered in, the 2005 Debt Exchange and the 2010 Debt Exchange." Trinity Am. Compl. (Ex. O at 2). In addition, it references the Republic's "defaulted" and "untendered" debt throughout, discusses the Lock Law and the 2005 and 2010 Exchanges,

---

[7] The Republic understands plaintiffs to be referencing Quarterly Reports issued by the Republic and refers to them as such.

and even mentions the litigation over the defaulted debt. *See, e.g.,* Trinity Am. Compl. (Ex. O at 2, 8, 16–17, 26, 152–53).

All of these facts show that neither the "Trimester Statements" nor the 18-K Annual Report serve as an "acknowledgement" under § 17-101, particularly when viewed against the legislative backdrop that the statute seeks to *limit* the instances in which an acknowledgement revives a cause of action. *See generally* Block Decl. (Ex. M at 115–17) (Law Revision Commission, First Report of the Commissioners on Practice and Pleadings: Code of Procedure (1848)). Accordingly, plaintiffs have failed to show an "acknowledgement" that restarted the statute of limitations.

### 3.    Plaintiff White Hawthorne, LLC's Request for Leave to Amend

The court now turns to plaintiff White Hawthorne's request for leave to once more amend its complaint for declaratory relief. Specifically, White Hawthorne seeks to add a claim for declaratory judgment stating that it "will be entitled, in 2023, to its *pro rata* portion of the collateral pledged by Argentina as security the principal due under [the] Brady Bond." Pl. Br. at 45.

Although district courts should "freely give leave [to amend] when justice so requires," Fed. R. Civ. P. 15(a)(2), leave should be denied if the amendment would be futile. *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir. 2007). Amendments are futile if the proposed claims would fail to establish an "actual controversy," as required under the Declaratory Judgment Act and Article III of the U.S. Constitution. *See, e.g., Gilbert, Segall & Young v. Bank of Montreal,* 785 F. Supp. 453, 458 (S.D.N.Y. 1992). An "actual controversy" must

be "substantial . . . between parties having adverse legal interests, of *sufficient immediacy* and *reality* to warrant the issuance of a declaratory judgment." *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941) (emphasis added). Thus, controversies that are merely "hypothetical, abstract, or academic" are not justiciable and must be dismissed. *Muller v. Olin Mathieson Chem. Corp.*, 404 F.2d 501, 504 (2d Cir. 1968).

White Hawthorne's proposed claim for declaratory relief is not an "actual controversy" suitable for adjudication. In support of its request to amend, White Hawthorne asserts that the Republic's motion to dismiss contains an argument that the Republic would owe nothing to White Hawthorne on the Brady Bond collateral, in addition to the Brady Bond principal and interest. Pl. Br. at 46. But that is not the case. The Republic expressly states that it "has never indicated that White Hawthorne, LLC is not entitled to the Brady Bond collateral." Def. Reply Br. at 29, n.14. This statement is admittedly vague, but it is clear at least in one regard: White Hawthorne's entitlement to the Brady Bond collateral is not currently at issue and may not be at issue, if at all, until 2023.

Perhaps in the future – and perhaps even before White Hawthorne's rights to the Brady Bond collateral vest in 2023 – some events may occur that would cause this issue to ripen. But that inquiry is too speculative at this juncture to present an "actual controversy." The court therefore denies White Hawthorne's request for leave to amend its complaint.

<u>Conclusion</u>

For the foregoing reasons, the court grants the Republic's motion.

SO ORDERED

Dated: New York, New York
      December 22, 2016

                                     Thomas P. Griesa
                                     United States District Judge